IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 1, 2019

## IN RE DAISY A.[1]

**Appeal from the Juvenile Court for Cocke County**
**No. CU-05749       Brad Lewis Davidson, Judge**

_____

**No. E2019-00561-COA-R3-PT**

_____

A mother whose parental rights to her daughter were terminated appeals the court's best interest determination. Upon our review of the evidence, we affirm the trial court's holdings that clear and convincing evidence existed to sustain three grounds for termination and that termination is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

Ryan T. Logue, Newport, Tennessee, for the appellant, Autumn S.

Lucy D. Hooper, Newport, Tennessee, for the appellees, Sandy A. and Grant A.

## OPINION

### I.       FACTUAL AND PROCEDURAL HISTORY

Daisy A. was born in 2015 in Hamblen County, Tennessee, to Autumn S. ("Mother") and Andrew A. ("Father"); at the time she gave birth, Mother was 19 years old. Mother, Father, and Daisy resided in the home of Father's parents, Sandy and Grant A. ("Grandmother" and "Grandfather" or collectively, "Grandparents"). Initially, Daisy was cared for by Mother and Father in a separate part of the house, but in January 2016, they moved her into the Grandparents' portion of the home and the Grandparents assumed caretaking duties of Daisy. Mother and Father's relationship was tumultuous, with daily drug usage; as their relationship deteriorated, Mother moved out of the home

_____

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

in the fall of 2016.

In November 2016, Grandmother filed a petition in the Juvenile Court of Cocke County asserting that Daisy was dependent and neglected and had been found "in [the] yard surrounded by dogs, alone while parent in house asleep." The petition alleged that Mother had been seen smoking marijuana in the home and drinking at a party and has "stayed gone all night or not come home for several days over past 2 weeks"; Grandmother sought custody of Daisy. After a hearing, the juvenile court entered an agreed order placing custody of Daisy with Grandparents and granting them "full authority to consent to any medical, hospital, scholastic, psychological or insurance care as needed to provide for the child(ren) while in his/her/their care." The agreed order was signed by Mother, Father, Grandmother, and Grandfather.

Grandparents filed a petition for termination of Mother's parental rights to Daisy On January 26, 2018. Father joined in the petition and alleged that he "is the legal and biological father of the minor child . . . and plans on voluntarily terminating his parental rights to allow Petitioners to adopt the child if this termination action is successful."

As grounds for termination, the petition alleged persistence of conditions, pursuant to Tennessee Code Annotated section 36-1-113(g)(3); abandonment by willful failure to visit and support, pursuant to section 36-1-113(g)(1) and 36-1-102(1)(A)(1); and failure to manifest an ability and willingness to assume legal, physical, or financial responsibility for the child, pursuant to section 36-1-113(g)(14). The petition also alleged that termination of Mother's rights was in Daisy's best interest.

Status hearings in the dependent and neglect proceeding were held on April 9 and May 3; at both hearings, Mother appeared and represented to the court that she was in the process of retaining an attorney. The trial court appointed a guardian *ad litem* on April 9. On June 5, Grandparents moved for a default judgment due to Mother's failure to file an answer or otherwise make a defense, despite appearing before the court twice and representing that she was hiring an attorney; the matter was set for June 14, but there is no indication in the record that a hearing on the default judgment was held on that date.

On August 3, Grandparents moved the court to order Mother to undergo urine and hair follicle drug screenings. A hearing on the motion was held on August 14 and an order entered the same day; the order recites that Mother agreed to submit to a urine drug screen which "was done in court" that day and "was positive for marijuana," and to undergo a hair follicle drug screen on August 17. An August 22, 2018 report of the results from the hair follicle drug screen was entered as an exhibit at trial and indicates that Mother tested positive for marijuana.

A trial was held on the petition to terminate Mother's rights on March 5 and 8, 2019, at which five witnesses testified: Mother, two of Mother's coworkers,

Grandmother, and Mother's mother; 39 exhibits were entered into evidence. On March 18 the court entered an order terminating Mother's parental rights on the grounds of abandonment by willfully failing to support and visit Daisy and Mother's failure to manifest an ability and willingness to assume custody of Daisy, such that that placing Daisy in Mother's custody would pose a risk of substantial harm to her physical or psychological welfare. The court also found by clear and convincing evidence that termination of Mother's rights was in Daisy's best interest. An amended order was entered on March 25; the only difference is that the amended order removed a provision that had relieved Mother's attorney and the Guardian *ad litem* from further representation. Mother timely filed her notice of appeal, and does not contest the court's holdings that the evidence supports the grounds upon which her rights were terminated; she only appeals the findings that four statutory factors render it in Daisy's best interest to terminate Mother's parental rights.

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish

the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

### III. ANALYSIS

Even though Mother only appeals the court's best interest determination, we are obliged to first consider whether the evidence clearly and convincingly established that grounds existed to terminate Mother's rights. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) *cert. denied sub. nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016) ("[I]n an appeal from an order terminating parental rights[,] the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

At the beginning of the trial, Grandparents informed the court that they were not pursuing termination on the ground of persistence of conditions because there had not been an adjudication of dependency and neglect. Accordingly, the court made no findings with respect to that ground and did not terminate Mother's rights on that ground. We will examine the proof relative to the three other grounds to determine whether clear and convincing evidence exists in the record to establish the grounds of abandonment by failure to visit and support and failure to manifest a willingness to assume custody.

### A. Grounds for Termination

### 1. Abandonment

Abandonment is identified as a ground for termination in Tennessee Code Annotated section 36-1-116(g)(1); at the time the petition was filed, "abandonment" was defined at section 36-1-102(1)(A) as:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> > (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian

- 4 -

or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A).[2] Because the petition for termination was filed on January 26, 2018, the pertinent time period in this case is September 26, 2017 to January 25, 2018.

In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination cases:

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. . . . Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not

---

[2] Effective July 1, 2018, the the Tennessee General Assembly "amended this subsection to remove the element of willfulness from the decision of abandonment by failure to support or visit. Rather than include willfulness as an element of the ground, Tenn. Code Ann. § 36-1-102(1) now provides that it is an affirmative defense[.]" *In re Alexis S.*, No. E2018-01989-COA-R3-PT, 2019 WL 5586820, at *3 n.4 (Tenn. Ct. App. Oct. 29, 2019) (citing Tenn. Code Ann. § 36-1-102(1)(I) (2019)). Although the trial took place after the amendment took effect, the amended version of the statute is not to be applied to a termination petition filed prior to the statute's effective date. *See In re Gabriel B.,* No. W2017-02514-COA-R3-PT, 2018 WL 3532078 at *4 n.7 (Tenn. Ct. App. July 23, 2018) (citing *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004)).

provide justification for the parent's failure to support the child financially.

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* at 863-64 (citations and footnotes omitted).

### a. Abandonment by Failure to Support

The petitioner has the burden of proving a parent's income and ability to pay when establishing willful failure to support. *In re Anna B.*, No. M2016-00694-COA-R3-PT, 2017 WL 436510, at *7 (Tenn. Ct. App. Feb. 1, 2017) (*no perm. app. filed*). This can be established through evidence showing the parent was able to support the child. *In re Noah B.B.*, E2014-01676-COA-R3-PT, 2015 WL 1186018 at *9 (Tenn. Ct. App. Mar. 12, 2015) (*no perm. app. filed*). Mother testified that she did not pay money to Grandparents during the time period of September 26, 2017 to January 25, 2018, for the support of Daisy.

With respect to her ability to pay during the period at issue, Mother testified that she worked at Olive Garden restaurant in November, and from November 13, 2017 until May 14, 2018, and estimated that she made $300 "[o]n weeks I worked full hours" there; that, prior to that job, she worked at Ruby Tuesday's restaurant, but left "the last week of September maybe or the first week of October," and made $250 to $300 per week bartending there. Mother also testified that she earned $200 being a disc jockey on two separate occasions. Her 2017 tax return shows that she made slightly more than $13,000 in wages, salaries, and tips that year. Mother also testified that she received money from her mother in the fall of 2017; at trial, she testified that her mother gave her $50, but agreed that she had previously testified in her deposition that her mother had given her $100-$150 for her birthday in September 2017.[3]

With respect to her expenses, Mother testified that during the pertinent time period, she had a car payment of between $260-$270 per month; car insurance of approximately $90 per month; $50 per month for her phone; that she didn't pay rent or utilities during the fall of 2017; that she spent around $15 a day on food for herself and $40 a week on food for her dog. Pertinent to this issue, but not considered as expenses

---

[3] Mother testified that she has always been able to find employment and worked at Ole Smokey Moonshine from July 5, 2016 through April 24, 2017, where she made $300-$400 per week. At the time of trial, she was working one or two days a week at the Double S Wine Bar in Knoxville and at the Chop House in Fountain City.

for purposes of our inquiry, is Mother's testimony that during the relevant time period, she bought marijuana and was using it every other day; that she spent $65 on a "quarter" of marijuana in November 2017; that in the last week of September 2017, she traveled to Ohio with her then-boyfriend and spent between $250 and $275 for a ticket to the four-day Lost Lands Festival, where she smoked pot and drank; and that she traveled to Knoxville and paid $15 or $20 to see a concert.

As for in-kind support, Mother testified that she had bought a box of diapers "a few times." Grandmother testified that Mother provided "two things of diapers and a couple . . . bags of wipes one time." As for other support Mother provided Daisy, Grandmother testified that Mother's visits with Daisy usually took place at fast food restaurants where Grandmother bought Daisy's food; that Daisy's birthday and Christmas fell during the pertinent time period, and Mother did not provide any gifts for Daisy's birthday and that Mother gave Daisy approximately $15 worth of toys as Christmas presents at the visitation the week prior to Christmas.

The trial court made thorough factual findings in this regard, none of which are challenged by Mother on appeal, and concluded that clear and convincing evidence existed to establish this ground for termination. From our review of the record, the trial court's findings are supported by the testimony and exhibits in the record. The evidence makes clear that Mother had the capacity to work during the relevant time period and did work for much of it, which provided her the means to pay her expenses as well as providing discretionary funds for travel and entertainment. Clear and convincing evidence shows that Mother's failure to support Daisy was willful, and we affirm the court's holding in that regard.

### b. Abandonment by Failure to Visit

The trial court held that "[t]here exists clear and convincing evidence of Respondent's abandonment of the minor child for willful failure to visit and the visitation that occurred during the pertinent time period was 'token visitation.'" The order contains numerous factual findings relating to this ground, none of which are disputed by Mother. Upon our review, we conclude that the evidence supports the trial court's factual findings and holding.

Tennessee Code Annotated section 36-1-102(1)(C) defines "token visitation" as "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." As this Court stated in *In re Jayvien O.*:

> Determining whether Mother's visitation amounted to token visitation "requires that we examine the frequency, duration, and quality of

- 7 -

the visits that occurred." *In re Keri C.,* 384 S.W.3d 731, 750 (Tenn. Ct. App. 2010). To determine whether visitation was sufficient, "the court should consider quality as well as quantity." *In re L.J.,* No. E2014–02042– COA–R3–PT, 2015 WL 5121111, at *4 (Tenn. Ct. App. Aug. 31, 2015) (*no perm. app. filed*). The concept of visitation requires "'much more than a mere physical presence.'" *Id.* (quoting *State Dep't of Children's Servs. v. L.L.T.*, No. E2003–00501–COA–R3–JV, 2003 WL 23094559, at *4 (Tenn. Ct. App. Dec. 30, 2003)).

No. W2015-02268-COA-R3-PT, 2016 WL 3268683, at *6 (Tenn. Ct. App. June 7, 2016).

Exhibit 36, a record of Mother's visits which Grandmother prepared, shows that Mother had five visits totaling 9.5 hours during the pertinent time period; Mother testified that the visits were scheduled to accommodate Daisy's schedule, as well as her own and the Petitioners' schedule.[4] Grandmother testified that Mother was forty minutes late at the first visit and appeared to be hungover because she "s[a]t at the picnic table with the head on the table"; that Mother showed up to another visit dressed in a T-shirt and fishnet stockings and heavy makeup; that at other visits, Mother spent a lot of time on her phone and that Grandmother would have to prompt Mother to take Daisy to the playground rather than sitting at the table and talking to Grandmother because "it was supposed to be time for her and Daisy"; that she did not deny Mother visitation and that Mother never asked to visit Daisy for a full day or overnight. With particular relevance to the quality of Mother's visits and, by extension, her relationship with Daisy, Grandmother testified that Daisy does not mention or ask about Mother in between visits, describing their relationship as follows:

> She is no more familiar with Autumn really than she with other people that we see in our lives at church or at, you know, places we visit. She sees Autumn as someone that she plays with sometimes but she doesn't really have that connection with her like a child would typically have with a mother figure and see her as someone that's caring for her.
>
> ***
>
> She does connect the word mommy to Autumn but she has also called other people mommy. She has called Autumn's mother mommy at a recent visit to McDonald's. . . . Autumn's mom was saying, . . ." What's my name?" And she called her mommy. She has called . . . my son's girlfriend mommy

---

[4] Additionally, in her deposition, which was admitted as an exhibit at trial, Mother agreed that her visits were not meaningful because they were "not long enough" but that "it [was] like all the time, I guess, we could work out with [Grandmother's] schedule and my schedule and Daisy's eating, sleeping, whatever schedule."

as well so the term to her is not necessarily been solely connected to Autumn.

The foregoing testimony shows that Mother was able to visit Daisy and only visited her five times during the relevant four-month period. Although Daisy's birthday and the Christmas holidays fell during that time period, Mother did not ask for or attempt to visit with Daisy on those days. During the five visits, the evidence shows that Mother was not fully present and engaged with Daisy but, rather, spent much of their time together on her phone, such that her interaction with Daisy was minimal and insubstantial. Mother's behavior was willful within the meaning of section 36-1-102(1)(A)(i), and we agree with the trial court that the evidence that Mother's visits amount to token visitation and that she did not make a reasonable attempt to establish a meaningful relationship with Daisy is clear and convincing; we affirm the holding that Mother has abandoned Daisy by willfully failing to visit her.

## 2. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides:

A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, Petitioners must prove that Mother failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of Daisy. Tenn. Code Ann. § 36-1-113(g)(14). Then, they must prove that placing Daisy in Mother's custody would pose a risk of substantial harm to her physical or psychological welfare. *Id.*

In *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), a panel of this Court held that a party seeking to terminate a parent's rights must prove by clear and convincing evidence that the parents failed to manifest both an ability and a willingness to personally assume legal and physical custody of the child or that they failed to manifest an ability and a willingness to personally assume financial responsibility for the child. When evaluating ability, we focus "on the parent's lifestyle and circumstances." *Id.* "When evaluating willingness, we look for more than mere words." *Id.* Rather, a parent must have demonstrated willingness "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.*

The court made numerous findings with respect to this ground, which related to Mother's lifestyle, drug usage, mental health, lack of safe, stable, and drug-free housing, and her paramours, none of which findings are contested by Mother. Upon our review, we conclude that all of the findings are supported by clear and convincing evidence.

With respect to her housing arrangement, Mother testified that, at the time of trial, she did not have her own home and was living with her boyfriend Cody at his parents' home:

> Q: You live with Cody, your boyfriend . . . ; right?
> A: Yes.
> ***
> Q: Okay. Is this house appropriate for Daisy? Did you say there would be a room for her?
> A: Yes.
> Q: Okay. Is that set up for Daisy right now? Do you have any beds or...
> A: Yes. There's big bed and a TV and basic things, yes.
> Q: Okay. What kind of bed is it? Did you say it was futon?
> A: Well it was and we bought a brand new like a new like huge mattress for it. Like it's more comfortable than our bed honestly so...(witness paused)...
> Q: Okay. Who lives in the home?
> A: Right now me, Cody and his parents as well but they have another home they own that they're like renovating but they plan on being back out of in the next few weeks and sell this house or... ...rent it out or...(witness paused)...I don't know.
> Q. So there's four (4) of you in the home right now?
> A: Yes.
> Q: And how many bedrooms?
> A: Three (3) and then an extra like office space room that could be a bedroom if we needed it.
> Q: Okay. Have you asked Cody's parents if...if you did get Daisy back if she could live there?
> A: Yes they're excited. They want to meet her and be involved in her life as well.
> Q: Okay. And if you break up with Cody, what's the plan?
> A: I could always go home if I wanted to. But like I said, I mean, I have no short coming of people who love me and are willing to love Daisy just as much and have a house over my head anywhere I needed to be.
> Q: Do you feel like your mom's house is appropriate for Daisy?
> A: Now, yes.
> Q: Has it been in the past?
> A: It wasn't before. There was way too many people living there and it just was not as clean as it should [have] been and mom has went above and

- 10 -

beyond to redo. They've redone...finished the floors... ...they've moved a lot of the stuff that was cluttered into a storage building[.]

In addition to the testimony recounted earlier of Mother's conduct and behavior during the period of September 26, 2017 to January 25, 2018, evidence was also introduced of Mother's social media accounts which contained numerous posts referencing drug use; Mother testified that she has used drugs, specifically marijuana, since she was a freshman in high school; that she "smoked weed a couple of times" while she was pregnant with Daisy; that she does not consider marijuana to be a drug and that she had traded items for marijuana; that she did not feel her marijuana usage affected her ability to work in any way; that she continued to use marijuana after custody of Daisy was placed with Grandparents and that she failed urine and hair follicle drug screens in August 2018; and that she tried cocaine one time and "tried acid twice in my whole life."

With respect to Mother's employment, Bernadette McCann, the Human Resources Director for Westgate Resorts, testified that Mother had been employed by Westgate but was terminated "due to vaping marijuana on property," which was a violation of the company's drug policy. Mr. Glenn Brown, Director of Sales for Westgate Smokey Mountain Resorts, testified that Mother admitted to him that she used marijuana on company property. He also testified that Mother had "numerous infractions" such as "being late, refusing to . . . take a tour, which is basically her job description, and . . . sometimes even being insubordinate."

With respect to her mental health, Mother testified as follows:

Q: Okay. Do you plan on staying THC free?
A: Maybe for a little while, yeah. Just using the CBD for anxiety and...(witness paused)...
Q: Okay. Well that brings us to your anxiety. Have you ever done like a mental health assessment? Have you ever sought treatment?
A: Yes from my doctor and stuff and that's what they classified like as bad anxiety.
***
Q: Did they tell you what you needed to do to maybe help your anxiety?
A: Well pretty much like, it was talked about like CBD oil actually... when it first become a big thing. . . . And they prescribed me I guess anti-depressants and stuff. I tried taking those for like a week and it was worse than being depressed and anxiety because you feel numb and... that's worse than not feeling anything so I'd rather not.
Q: Did...did you schedule up a follow up appointment with your provider to tell them that you didn't like the medication?
A: Yes I did and they were just like, "Well it's your choice if you want to take it or not," and I chose not to and I didn't get it refilled or anything.

Q: Did they give you any other suggestions of things that you could do, maybe like therapy?
A: Yeah kind of more like we talked about like nature therapy like hiking, like just other ways, taking even a drive on pretty day or something helps relieve me like...
Q: And how would...how would you say your mental health is right now?
A: Really good, I'm in a way better mental state. I love life and the beautiful side of things now.

Considering the foregoing testimony and the exhibits in the record, the holding that Mother has failed to manifest an ability or willingness to personally assume legal and physical custody or financial responsibility of Daisy is supported by clear and convincing evidence. Mother has made one $40 payment to Petitioners since Daisy was placed in their custody and has made no serious attempts to regain custody of her child. She testified that she contacted attorneys and came away from those meetings knowing that it would have been a "joke" for her to file a Petition for Visitation and that she knew what she needed to do to assume legal and physical custody of the minor child. Mother's actions since 2016 do not show her desire or willingness to take care of the child; her focus has clearly been elsewhere. Although the petition to terminate her rights had been pending for more than a year at the time of trial, Mother had not secured stable housing; the home where she resided at the time of trial belonged to her boyfriend's parents who "plan on being back out of [the house] in the next few weeks and sell this house or... rent it out or... I don't know."

We have not been cited to any evidence from which to conclude that Mother has shown a serious desire to assume responsibility for Daisy, or the ability to do so, assuming there were a desire.

Considering the second element of this ground, this Court has observed the following regarding the requirement of "substantial harm":

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

Mother acknowledged her continued drug use until two and half weeks before

trial, her continued vaping of CBD oil, her belief that marijuana is not a drug, and that the man she currently lives with continues to smoke marijuana on a daily basis. Mother testified that she quit smoking marijuana shortly before the termination hearing in order to qualify for a job she wanted. The evidence clearly and convincingly establishes that Mother does not have a stable housing situation and that her history of drug use and her decision to live with someone who smokes marijuana on a daily basis pose a risk of substantial harm to Daisy's physical and psychological welfare. Accordingly, we hold that this ground for termination was established by clear and convincing evidence and affirm the trial court's holding in that regard.

## B. Best Interest

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The Legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[5] The list of factors in the statute "is not exhaustive, and the statute

---

[5] The factors at Tennessee Code Annotated section 36-1-113(i) are:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
>> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>> (8) Whether the parent's or guardian's mental and/or emotional status would be

- 13 -

does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

The Tennessee Supreme Court recently explained:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.,* 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child...." Tenn. Code Ann. § 36–1–101(d) (2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681–82 (Tenn. 2017).

The trial court made findings with respect to factors (1), (3), (4), (5), (6), (7), (8), and (9). On appeal, Mother takes issue with the Court's findings relative to factors (1), (4), (5), and (8). The court's specific findings relative to those factors were:

---

detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

[1] Respondent has failed to make such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home. She continues to use drugs and has recently lost a good job due to drug use. She has tested positive for drugs in this action and testified she would test positive at the time of the hearing. She has a pattern of living with boyfriends who utilize drugs and is currently living with a boyfriend whose parents own the home and where having and using marijuana in the home is acceptable. Respondent admitted she needed a more stable home and one to call her own. She has presented no proof to this court that she has a stable, drug free home. Since the minor child was removed from her custody, Respondent has presented no objective evidence to adjustments to her circumstances in a positive manner and she has not adjusted her conduct so that is would be safe for the minor child and the child's best interest to be in her home.

\*\*\*

[4] Respondent ha[s] had visits with the minor child; however, the court finds there exists no meaningful relationship with the child and the court incorporates its findings under paragraph eleven (11) above [relating to the three grounds for termination]. There was no evidence presented to show that if Respondent's parental rights are terminated it would affect the minor child in a negative way.

[5] A change of caretakers and physical environment is likely to have an extremely negative impact on the child's emotional, psychological and medical condition as she is doing well and thriving in the home with Petitioners. The evidence showed she is safe, stable and happy in the home with Petitioners which is the only home he has ever known. The child is highly social and well adjusted and at her age needs the structure and stability provided by Petitioners.

\*\*\*

[8] Respondent's mental and/or emotional status would be detrimental to the child or prevents Respondent from effectively providing safe and stable care and supervision for the child. Respondent reported suffering mental health issues and was prescribed medications which she refused to take. She has a history of threatening suicide and holding a gun to her head. She testified she needed a healthier mindset for the minor child.

With respect to factor (1), Mother contends on appeal that "there is insufficient

proof to indicate Mother failed to adjust her circumstances from the time [the] child came into Petitioners/Appellees' custody." To support this position, she cites to one page of her testimony that her boyfriend's family "is excited at the possibility of the child coming to live with them."

With respect to factor (4), Mother argues that the record does not indicate that Mother has failed to maintain regular visitation; in support, she cites her testimony that at the end of a visit a few weeks prior to the termination hearing, "Daisy was asking to please stay with her mommy and play."

With respect to factor 5, Mother argues that being reduced to a complete stranger "could have equally detrimental emotional or psychological impacts on the child." She faults the Petitioners for not offering expert testimony that removing [the] child from her current caregivers would have "detrimental emotional and psychological effects," But does not cite to evidence that preponderates against the trial court's finding that Daisy is doing well and thriving, and that Daisy needs the structure and stability provided by the Petitioners.

With respect to factor (8), Mother states that while the Court commented that Mother "still act[s] like a teenager" and "still want[s] to go to parties, . . . to concerts, . . . to party and drink and smoke pot," it also complemented her on her work ethic.[6] Mother argues that she "has potential to be a provider to her child given the opportunity" and, to support this assertion, cites to her testimony that she has worked since she was 16 years old and recently quit smoking pot for two and a half weeks so that she could obtain better employment.

We have carefully considered the testimony on which Mother relies in arguing that the evidence preponderates against the trial court's factual findings. The testimony cited by Mother, placed in context and viewed with the other testimony and exhibits, does not preponderate against the trial court's findings. We have carefully reviewed the entire record in this case. We are of the firm conviction that the trial court's findings at to Daisy's best interest are supported by the record. In addition to the evidence we have detailed in our discussion of the grounds for termination, we also find the following evidence pertinent to the best interest determination.

The testimony and photographic evidence show that Mother neglected Daisy in her early infancy. Grandmother testified that the child would go for hours without having her diaper changed and that the portion of the home in which Mother, Father, and Daisy lived was filthy, with dirty diapers lying around and that drugs and drug paraphernalia were present. Grandmother also testified that Mother was ambivalent about spending

---

[6] Those statements by the Court were made in the course of its oral ruling, and were not incorporated into the final order.

time with Daisy and that Mother would not come home at night or come home very late. Mother testified that she has struggled with anxiety and depression has addressed her diagnosed mental health issues by self-medicating with marijuana and vaping CBD oil. The evidence also shows that Mother's current living environment is unstable and not suitable for a child. Mother is living with her boyfriend in his parent's home that they might sell or rent out at any point. Though Mother testified that there was a room for Daisy in the house and that she had sent photos of it to her attorney, no photos were ever made part of the record. Moreover, her testimony about the presence of drugs and her boyfriend's use of drugs (and his parents' acquiescence to that use) illustrates that the home is not suitable for a child. We have already held that the record contains clear and convincing evidence that Mother has failed to provide support for Daisy and has failed to maintain regular contact or otherwise establish a meaningful relationship with Daisy such that Daisy calls many people "Mommy" and views Mother as a playmate.

Mother testified that Sandy was properly feeding Daisy, that Grandparents have provided for her needs and are dependable people, that Daisy is happy, doing well and being cared for. Grandmother testified that Daisy calls their house "home" and has her own room there. She described Daisy's relationship with her and Grandfather as "very strongly bonded." When asked what effect changing caretakers would have on Daisy, Grandmother testified:

> I think it would be very devastating to Daisy. Daisy is a very habitual...has a very habitual personality. She has high expectations that things are going a certain way. She tends to have a little bit almost of an OCD character. In fact, it's to the point we've even discussed it with a pediatrician. Just things like the placement of certain items, if they're not in the particular order that she thinks that they're supposed to be and that they're always...you know, the salt and pepper on the table or her toys and where they're stored and those kinds of things, then she will get upset and she cannot settle until those things are put into their place and so she is very much aware of those types of things. . . .

The record clearly establishes termination of Mother's parental rights is in Daisy's best interest.

## IV. CONCLUSION

For the foregoing reasons, we affirm the termination of Mother's parental rights.

_____
RICHARD H. DINKINS, JUDGE